IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 5:13-cr-00139-RDP-MHH |
| | ) | |
| CORTEZ DEAUNDRA CARR, et al., | ) | |

**MEMORANDUM OPINION**

Before the court is the Government's motion for a protective order relating to the Government's disclosure of its prosecution memorandum in this case to one (1) of the twenty-three (23) defendants named in the Indictment. (Doc. 113). Because of the sensitive nature of the information contained in the prosecution memorandum, the court set the motion for hearing and required *all* defense counsel to attend. At the conclusion of the hearing, the court retrieved all known copies of the prosecution memorandum. For the reasons stated below, the court finds that the Government's disclosure of the prosecution memorandum was inadvertent, and that the Government's motion for protective order is due to be granted.

**I.    INTRODUCTION**

A government prosecution memorandum, commonly called a "prosecution memo" or a "pros memo," constitutes attorney work-product. *U.S. v. Armstrong*, 517 U.S. 456, 463 (1996). It is "a document internal to the United States Attorney and Department of Justice community that contains a summary of evidence, identifiers of individuals to include addresses, dates of birth, and Social Security numbers. Oftentimes, these documents contain mental impressions and conclusions of the AUSA assigned to the case." (Doc. 113, ¶ 3). Additionally, prosecution memos often summarize information that the Government obtained about its case from confidential informants; prosecution

memos may contain identifying information about those informants. In the hands of defense counsel, prosecution memos are a goldmine. In the hands of alleged criminal defendants and others, prosecution memos may endanger confidential informants and their families.

The first page of the prosecutive memo at issue here has the case's style on the entirety of its first page. Though apparently it is typical of prosecution memos drafted by attorneys in the Government office in Huntsville, Alabama, to include the style of the case, that is not the format used in other offices.[1] In turn, this seemingly insignificant stylistic choice contributed to the series of events that gave rise to its disclosure, and that disclosure in turn has raised important procedural and ethical considerations that frame the court's analysis of the Government's motion for protective order.

Procedurally, prosecution memos are not subject to discovery in criminal cases. In fact, Rule 16(a)(2) of the Federal Rules of Criminal Procedure provides, in pertinent part:

> Except as Rule 16(a)(1) provides otherwise, this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case.

Fed. R. Crim. P. 16(a)(2). Under Rule 16(a)(2), a defendant, "may not examine Government work-product in connection with his case." *Armstrong*, 517 U.S. at 463. Accordingly, the court finds that the Government's disclosure of a prosecution memo is presumptively inadvertent. But even if that were not so, such a disclosure (particularly in light of the circumstances of this case) at a minimum

---

[1] Indeed, the particular prosecution memo at issue here was unusual in the scope of the larger Government prosecution community because the first page of the prosecution memo bore the case's style.

raises all sorts of yellow caution flags that should lead responsible counsel to investigate whether the disclosure was in fact inadvertent.

The ethical rule that governs attorney conduct upon the receipt of an inadvertent disclosure of privileged material is clear. It states:

> (b) A lawyer who receives a document that on its face appears to be subject to the attorney-client privilege or otherwise confidential, and who knows or reasonably should know that the document was inadvertently sent, should promptly notify the sender and (1) abide by the reasonable instructions of the sender regarding the disposition of the document; or (2) submit the issue to an appropriate tribunal for a determination of the disposition of the document.

*Alabama Rules of Prof'l Conduct*, R. 4.4.[2] With these rules in mind, the court examines the Government's motion for protective order.

## II. OPERATIVE FACTS

The Indictment in this case concerns alleged conspiracies to possess and distribute cocaine, crack cocaine, and marijuana. (Doc. 1). Initially, the Grand Jury named 23 defendants in the

---

[2] The Local Rules for the United States District Court for the Northern District of Alabama incorporate the *Alabama Rules of Professional Conduct* by reference. Specifically, Local Rule 83.1(f) provides:

> (f) Standards for Professional Conduct; Obligations. Each attorney who is admitted to the bar of this court or who appears in this court pursuant to subsection (b) or (c) of this Rule is required to be familiar with, and shall be governed by, the Local Rules of this court and, to the extent not inconsistent with the preceding, the Alabama Rules of Professional Conduct adopted by the Alabama Supreme Court and, to the extent not inconsistent with the preceding, the American Bar Association Model Rules of Professional Conduct, except Rule 3.8(f) thereof. Acts and omissions by any such attorney which violate such standards, individually or in concert with any other persons, shall constitute misconduct, whether or not occurring in the course of an attorney-client relationship, and shall be grounds for discipline, as shall the commission by an attorney of any serious crime. Discipline under this Rule may consist of disbarment, suspension, censure, reprimand, removal from a particular case, ineligibility for appointment as court-appointed counsel, ineligibility to appear under subsections (b) and (c), monetary sanctions, or any other sanction the court may deem appropriate.

Local Rule 83.1(f) *available at* http://www.alnd.uscourts.gov/Local/local_rules.htm.

Indictment. One of those defendants is Quincy Tywy Ellington. (Doc. 1, p. 1). "On May 23, 2013, the Federal Bureau of Investigation (FBI) along with partner law enforcement agencies executed arrest warrants" in this case. (Doc. 113, ¶ 1). Because Mr. Ellington resides near Atlanta, Georgia, "his arrest was handled by the FBI office there." (Doc. 113, ¶ 2).

"[T]o facilitate the processing of Defendant Ellington, an Assistant United States Attorney (AUSA) in the Northern District of Georgia was provided with a copy of the [I]ndictment and the prosecutive memorandum." (Doc. 113, ¶ 2). An FBI agent in Georgia emailed the Indictment and the prosecution memo to the Georgia AUSA as a single electronic document. When the AUSA received the document, she printed it and brought it with her to court for Mr. Ellington's initial appearance. Because the first page of the prosecution memo bore the style of the case, when the Georgia AUSA glanced through the document, she thought that the document contained two copies of the Indictment. Consequently, before leaving for court, she printed a copy of the document and carried the Indictment and the prosecution memo with her, and gave the documents to the courtroom deputy. The courtroom deputy in turn, apparently also believed that the prosecution memo was a second copy of the Indictment, placed the documents on the table for Defendant Ellington and the Federal Public Defender (in Atlanta) so that the two could prepare for Mr. Ellington's initial appearance. (Doc. 97, p. 2).

The Atlanta-based Federal Public Defender picked up the Indictment and handed the prosecution memo to Mr. Ellington, also thinking that he was giving Mr. Ellington a copy of the Indictment. As he began reviewing the Indictment with Mr. Ellington, the Federal Public Defender realized that the paper that Mr. Ellington had was not identical to the Indictment he was reading. After taking a closer look at the paper that Mr. Ellington was holding, the Federal Public Defender

saw that it was labeled a prosecution memo. The Federal Public Defender thought it strange that the AUSA would give the defendant a copy of the prosecution memo; however, he supposed that Alabama AUSAs share prosecution memos with defendants or they use prosecution memos to create probable cause statements to support complaints. Accordingly, at the hearing in Georgia, the Federal Public Defender did not mention the disclosure to the AUSA.

After Mr. Ellington's initial appearance, the courtroom deputy gave Mr. Ellington, "both the [I]ndictment and the prosecutive memorandum . . . as part of his paperwork package as he was transported" to the Atlanta City Jail. Mr. Ellington was housed at the Atlanta City Jail for one week while he awaited transfer to the Northern District of Alabama for his detention hearing. (Doc. 113, ¶ 4).

Mr. Ellington's legal papers, including the prosecution memo, traveled with him from Georgia to Alabama. Magistrate Judge Harwell Davis appointed Michael Rasmussen, a member of the CJA panel, to represent Mr. Ellington. (May 31, 2013 docket entry). At Mr. Ellington's June 3, 2013 detention hearing in Huntsville, Alabama, Mr. Rasmussen discovered that Mr. Ellington had a copy of the prosecution memo. Mr. Rasmussen had not brought the document to the court's attention, and he had not alerted the AUSA in Huntsville. Nevertheless, the AUSA, Terrence O'Rourke, became suspicious when questions that Mr. Rasmussen posed during the detention hearing indicated that Mr. Rasmussen was familiar with the prosecution memo.

The AUSA asked Mr. Rasmussen how he acquired the prosecution memo. Mr. Rasmussen explained that he understood that the courtroom deputy in Atlanta gave the prosecution memo to Mr. Ellington. (Doc. 113, ¶ 6). The AUSA learned that Mr. Rasmussen had provided a copy of the prosecution memo to Bill Barnett. Mr. Barnett is appointed counsel for defendant Tommy Childs,

III. (Doc. 113, ¶ 7). Before leaving Judge Davis's courtroom, in the presence of members of Judge Davis's courtroom staff, the AUSA confronted Mr. Rasmussen and Mr. Barnett and told them that, as former AUSAs, they should know better than to keep a copy of a prosecution memo. Mr. Barnett left the courtroom without responding. Mr. Rasmussen was initially defensive but eventually tore the first few pages from his copy of the prosecution memo and from Mr. Ellington's copy - the pages that contained the defendants' social security numbers and addresses - and gave only those first few pages to the AUSA; Mr. Rasmussen and Mr. Ellington each kept the balance of their respective copies of the prosecution memo. (Doc. 113, ¶ 8).

Courtroom staff advised Judge Lynwood Smith of the controversy concerning the prosecution memo. He notified Chief Magistrate Judge Ott and Magistrate Judge Haikala, the referral judge in this case, because he, very reasonably, was concerned that the prosecution memo might be circulating in one or more prisons, jeopardizing the safety of confidential informants. Magistrate Judge Haikala brought the situation to the attention of the undersigned. Meanwhile, the Government filed a motion for a protective order. In that motion, the Government stated that the prosecution memo:

> has references to individuals who have not been indicted, references to individuals not currently under investigation, and/or may touch upon or relate to matters which are currently the subject of ongoing criminal investigations in the Northern District of Alabama and elsewhere. Further, the document has the full address, date of birth, and Social Security number of every defendant in the present case. The document also contains Title III wiretap information that has not, as yet, been disclosed.

(Doc. 113, ¶ 9). The Government expressed concern about disclosure of the prosecution memo:

> Unlimited disclosure of these matters and/or the identities of certain individuals could result in the improper implication of certain

> individuals in criminal conduct, could jeopardize ongoing criminal investigations, and could expose to danger those who have or are believed to have cooperated with the government.

(Doc. 113, ¶ 9). Accordingly, the Government moved for a protective order governing the disclosure and handling of the prosecution memo. Specifically, the Government asked that the court:

> order that defense counsel receiving the document be ordered not to make any additional copies of said document and be ordered to immediately return the document to the United States Attorney's Office. The government also requests the [c]ourt order defense counsel to cease all further dissemination of the document. Further, the government moves that defense counsel be directed, if they have any questions or seek modification of any Order issued pursuant hereto, to seek guidance and/or clarification from the [c]ourt.

(Doc. 113, ¶ 9).

The court promptly set the motion for hearing on the afternoon of June 6, 2013. (Doc. 114). The court ordered the attorneys for each defendant to submit, for *in camera* review, by 10:00 a.m. on June 6, 2013, an affidavit which described the information that the attorney had regarding the prosecution memo. (Doc. 114, pp. 1-2). The order also required the Government to supply, under seal for *in camera* review, a list of every facility in which Mr. Ellington was incarcerated from May 23, 2013 until June 6, 2013, and the number of days that Mr. Ellington spent in each facility. (Doc. 114, p. 2). To discern as quickly as possible the extent to which the prosecution memo may have circulated within the jails in which Mr. Ellington was housed, the court contacted Magistrate Judge Baverman in Atlanta to trace the path that the prosecution memo followed after Mr. Ellington received the memo at his initial appearance.[3]

---

[3] In an email sent to the court after the hearing, Mr. Rasmussen inexplicably complains that the court may have "prejudged" his conduct and also expresses solicitude that the court made an "independent investigation by gathering information from people in Atlanta." To be sure, every judicial officer in this district who became aware of this circumstance was emphatically concerned that the prospect of a prosecution memo circulating in a prison facility could

7

The affidavits that attorneys submitted to the court suggested that only three defense attorneys knew of or had contact with the prosecution memo. At the hearing on the Government's motion for protective order, the attorneys who attended the hearing confirmed that the vast majority of them had no contact with or knowledge of the prosecution memo. Two attorneys who had not seen the prosecution memo expressed concern that the attorneys who had access to the prosecution memo might have a strategic advantage in representing their clients over those other attorneys for the defendants who did not have such access.

Over the course of the hearing on the Government's motion, the court examined Mr. O'Rourke, Mr. Rasmussen, Mr. Barnett, the Georgia AUSA who covered Mr. Ellington's initial appearance, the Federal Public Defender who represented Mr. Ellington at his initial appearance, and Mr. Ellington. The court collected Mr. Rasmussen, Mr. Barnett, and Mr. Ellington's copies of the prosecution memo. The court also heard argument from Mr. Rasmussen and Mr. Barnett.

The court questioned Mr. Ellington to try to determine whether he had copied and circulated the prosecution memo.[4] Mr. Ellington stated that the U.S. Marshal took his legal papers when he entered the Atlanta City Jail, and he did not have access to the papers again until his detention hearing. He added that after his detention hearing, he did not have a copy of the prosecution memo with him in jail. Although Mr. Ellington asserted that he was not familiar with the contents of the prosecution memo, Mr. Rasmussen stated that Mr. Ellington knew the memo "inside and out."

---

lead to dire consequences. To this point, the court's primary task has been to determine what happened and how it happened, and to take steps to protect parties and non-parties from potentially tragic consequences which could follow this disclosure.

[4] The court did not place Mr. Ellington under oath. The court appointed Alison Wallace, a CJA panel attorney, to represent Mr. Ellington at the hearing. Ms. Wallace met with Mr. Ellington before he spoke to the court, and the court advised Mr. Ellington of his right to remain silent.

Nevertheless, the hearing produced no evidence that suggested that Mr. Ellington shared the memo or discussed its contents with other prisoners while he was incarcerated.[5]

At the close of the hearing, the Court took the Government's motion under advisement.

## III. APPLICATION OF LAW TO OPERATIVE FACTS

The court finds that the Government's disclosure of the prosecution memorandum was inadvertent. As discussed above, prosecution memos are attorney work-product; disclosure of this prosecution memo, even if not presumptively inadvertent, occurred under circumstances that should have raised that issue in the minds of counsel who received it. The arguments that Mr. Rasmussen and Mr. Barnett have offered to suggest the disclosure was not inadvertent are simply unpersuasive. Mr. Rasmussen contends that the disclosure was not inadvertent because a courtroom deputy provided the memo to Mr. Ellington in open court. However, the overwhelming evidence in the record establishes that the Government did not realize that it had released the prosecution memo to a courtroom deputy or to Mr. Ellington and the courtroom deputy did not realize she was providing Mr. Ellington with that work product document. Because the prosecution memo bore the style of this case, the Georgia AUSA who received an email containing the Indictment and the prosecution memo shortly before Mr. Ellington's initial appearance mistook the prosecution memo for a second copy of the Indictment and provided the memo to the courtroom deputy who in turn provided a copy of the memo to Mr. Ellington. The Georgia Public Defender who represented Mr. Ellington at the initial appearance did not intercede because he surmised that the prosecution memo was a probable

---

[5] Before he was released on bond, Mr. Ellington was incarcerated in the Atlanta City Jail, the Morgan County and Cullman County jails, and the Robert A. Deyton Detention Facility.

cause statement. The mere fact that a court official played a role in the disclosure of the prosecution memo to Mr. Ellington does not render the Government's disclosure voluntary or intentional.

Both Mr. Rasmussen and Mr. Barnett acknowledged that when they served as AUSAs, they never shared a prosecution memo with a defendant (nor were they aware of any other AUSA having done so). They also admitted that after they left the United States Attorney's office and began working as defense counsel, they never received a copy of a prosecution memo from an AUSA at the beginning of a case (nor were they aware of this practice ever taking place). The Georgia AUSA testified that she has never provided a copy of a prosecution memo to a defendant or his counsel, and the Georgia Public Defender who represented Mr. Ellington confirmed that the United States Attorney's Office in Atlanta does not share copies of prosecution memos with defense counsel. Everyone other than Mr. Rasmussen and Mr. Barnett seems to fully understand that the disclosure of the memo was accidental.

Mr. Rasmussen and Mr. Barnett concede as they must that they are fully knowledgeable of such a memo's purpose and contents. Moreover, even a cursory review of the prosecution memo here would make clear that it is a confidential document. It follows that Mr. Rasmussen and Mr. Barnett reasonably should have known that the document was inadvertently disclosed, notwithstanding the fact that Mr. Rasmussen obtained a copy of the memo from Mr. Ellington's prisoner mail file. Mr. Rasmussen (as well as Mr. Barnett) should have alerted Mr. O'Rourke (or someone else with the U.S. Attorney's Office) promptly. In addition, Mr. Rasmussen either should have abided by any reasonable instructions that Mr. O'Rourke provided regarding disposition of the copies of the prosecution memo, or he should have submitted the issue to the court for a determination of the disposition of the memo. *Alabama Rules of Prof'l Conduct*, R. 4.4. He did

neither. Instead, Mr. Rasmussen gave Mr. O'Rourke the first few pages from his copy of the prosecution memo and from Mr. Ellington's copy of the prosecution memo – the pages that contained the defendants' addresses and social security numbers – and he refused to relinquish the balance of the memo to Mr. O'Rourke. Mr. Rasmussen did not file a motion with the court, asking for direction.[6]

Pursuant to Rule 16(d) of the Federal Rules of Criminal Procedure, the court, "may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." Fed. R. Crim. P. 16(d)(1). The court finds that there is good cause to recover all known copies of the prosecution memo and to prohibit further disclosure of the prosecution memo.[7] Indeed, the interests of justice favor retrieval and protection of the prosecution memo because the document has references to individuals who have not been indicted and to individuals whom the Government currently is not investigating. The document also contains information which may relate to matters which currently are the subject of ongoing criminal investigations in the Northern District of Alabama and elsewhere. Most importantly, information in the prosecution memo could reveal the identity of confidential informants and jeopardize their safety and the safety of their families. (Doc. 113, ¶ 9).[8]

---

[6] The court saves for another day the question of what consequences, if any, the court may impose if any attorney in this matter intentionally violated the Rules of Professional Conduct. Before reaching that issue, pursuant to Local Rule 83.1(f), the court would issue a show cause order and give the attorneys involved an opportunity to address the ethical implications of their conduct.

[7] The court believes that it already has secured all known copies of the prosecution memo. If any person, party, or counsel is aware (or becomes aware) of other copies of the prosecution memo, he should present them to the court at once or provide the court with information concerning the last known location of any copies of the memo.

[8] To maintain the integrity of these proceedings, the undersigned has not reviewed the prosecution memo. He is not familiar with the contents of the prosecution memo, so he is not in a position to pre-judge any of the issues that may arise during this litigation. Magistrate Judge Haikala has reviewed the contents of the prosecution memo to determine the extent to which disclosure of the prosecution memo might compromise the safety of others, including

## IV. CONCLUSION

For the reasons stated above, the court finds the Government's motion for protective order is due to be granted. (Doc. 113). The court will enter a separate order that details the scope and terms of the order.

**DONE** and **ORDERED** this ____24th____ day of June, 2013.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

unindicted individuals. Based on her review, Magistrate Judge Haikala has concluded that individuals familiar with the events giving rise to the conduct described in the Indictment and discussed in the prosecution memo easily could identify the individual(s) who cooperated with the Government. The court notes that if Mr. O'Rourke had not realized at the detention hearing that Mr. Rasmussen had a copy of the prosecution memo, it is likely that the prosecution memo would have achieved much wider circulation, increasing the chances that the prosecution memo might fall into the hands of individuals who would use it improperly.